FILED
2019 Sep-23 AM 11:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| AMY MICHELLE WILLIAMS,<br><br>    Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>    Defendant. | CIVIL ACTION NO.<br>2:18-cv-00474-KOB |

## MEMORANDUM OPINION

### I. INTRODUCTION

On April 22, 2015, the claimant, Amy Michelle Williams, applied for a period of disability and disability insurance benefits under Title XVI of the Social Security Act. (R. 15). In her application, the claimant alleged disability beginning on January 20, 2015 because of lumbar degenerative disc disease, piriformis syndrome, fibromyalgia, migraines, obesity, and obstructive sleep apnea. (R.18). The Commissioner denied the claim on June 29, 2015. (R. 15). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on March 29, 2017. (R. 30).

In a decision dated April 26, 2017, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was thus ineligible for social security disability benefits. (R. 12-23). On February 16, 2018, the Appeals Council denied the claimant's request for review. (R. 1-6). Consequently, the ALJ's decision became the final decision of the Commissioner. *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The claimant has exhausted her administrative remedies, and the court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3). For the reasons stated below, the court will affirm the Commissioner's decision.

## II. ISSUES PRESENTED

The claimant presents two issues for review:

(1) Whether the ALJ erred as a matter of law in discrediting the claimant's subjective testimony concerning the limitations caused by her migraines, fibromyalgia, sleep apnea, and obesity when evaluating her residual functional capacity; and

(2) Whether substantial evidence supports the ALJ's finding that the claimant *could* return to her past work despite the vocational expert testifying that, based on the claimant's RFC, the claimant *could not* perform her past work.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. The court must affirm the Commissioner's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. The court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The Commissioner's opinions on whether a claimant is disabled, the nature and extent of a claimant's RFC, and the application of vocational factors "are not medical opinions, . . . but

are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a listing and is qualified for social security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [ALJ]'s factual findings." *Walker*, 826 F.2d at 999. The court must not only look to those parts of the record that support the ALJ's decision, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C § 423(d)(1)(A), a person is entitled to disability benefits when she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." To determine whether a claimant meets the § 423(d)(1)(A) criteria, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?

(2) Is the person's impairment severe?

(3) Does the person's impairment meet or equal one of the specific impairments set

> forth in 20 C.F.R. pt. 404, subpart P, App. 1?
>
> (4) Is the person unable to perform his or her former occupation?
>
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on step three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The Eleventh Circuit has established a three-part "pain standard" that the ALJ must apply "when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). "The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Id*. Evidence that satisfies the pain standard "is itself sufficient to support a finding of disability." *Id.*

The pain standard requires more than a "single, conclusory statement" of the weight the ALJ gave the claimant's reported symptoms or a recitation of "the factors described in the regulations for evaluating symptoms." SSR 16-3p. Rather, if the ALJ finds that the claimant's complaints do not meet the pain standard and rejects the subjective testimony, then the ALJ must "articulate explicit and adequate reasons" for doing so. *Holt*, 921 F.2d at 1223. And "[a] clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (citation omitted).

The ALJ has a duty to fully and fairly develop the record. *See Lucas v. Sullivan*, 918 F.2d

1567, 1573 (11th Cir. 1990). In developing the record, the ALJ must state with particularity the weight he gave different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfaz v. Bowed*, 825 F.2d 278, 279 (11th Cir. 1987). The ALJ may reject any medical opinion if the evidence supports a contrary finding. *Skyock v Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). And the ALJ must give substantial weight to the medical opinion of a claimant's treating physician, but the ALJ is not required to base his disability determination on any one physician or outside entity. *Symonds v. Astrue*, 448 F. App'x 10, 12 (11th Cir. 2011).

## V. FACTS

The claimant was 36 years old at the time of the ALJ's final decision. (R. 33). The claimant has an associate degree in science and surgical technology and has past relevant work experience as a surgical technologist. (R. 34). The claimant also worked as a bartender, pawnbroker, receptionist, and sandwich maker. (R. 49-50). The claimant alleges disability based on neuropathy, sleep apnea, fibromyalgia, migraines, obesity, and chronic back pain. (R. 36-37).

*Physical Impairments*

From 2012 to 2015, the claimant regularly visited Neurology East Medical Center and complained of severe migraines, headaches, and numbness and tingling in the bilateral lower extremities. (R. 278-311). In August 2014, Dr. Diethelm conducted a nerve conduction study in an effort to diagnose the cause of the claimant's reported numbness and tingling in her bilateral extremities. The test results for both motor nerve function and sensory nerve function came back normal. (R. 268).

On September 29, 2014, CRNP Jessica Waine found that the claimant suffered from dysesthesia pain and neuropathic pain. (R. 282). The claimant visited Neurology East with increased frequency for migraine treatment between 2012 and 2015.

In January 2015, the claimant saw Dr. Roberts for severe back and foot pain. Dr. Roberts examined the claimant and found a positive straight leg raise about 45 degrees on the right and negative on the left. The physical examination showed that the claimant had tenderness in the paraspinal area of the lower lumbar region. (R. 321). An MRI showed mild concentric disc bulging and mild to moderate right NF stenosis on the L4-5 vertebrae, and a small right NF/far lateral protrusion and a mild right NF stenosis on the L5-S1 vertebrae. (R. 323). From these results, Dr. Roberts diagnosed the claimant with spondylosis, degenerative disc disease, and stenosis. (R. 323).

In February 2015, the claimant saw a neurologist, Dr. Fulmer. He performed a lumbar myelography on the claimant and found a mild flattening of the ventral surface of the ventricle sac, likely reflecting the impression of mild disc bulging at L3-4 and L4-5. (R. 325).

In March 2015, Dr. Fulmer conducted a physical exam and reported that the claimant had no weakness or numbness. He also analyzed the claimant's MRI from February 19, 2015 and found only slight stenosis. (R. 329). Dr. Fulmer believed that sciatica caused the slight stenosis, the decreased range of motion in the lumbar with flexion and extension, and the positive on the right straight leg raise test. (R. 330). Dr. Fulmer also conducted a neurological exam; the results of that test were normal. Dr. Fulmer wrote the claimant a note excusing her from work from February 26 to March 9, 2015. (R. 355).

Dr. Fulmer referred the claimant to Dr. Wilson at Neurosurgical Associates-Birmingham for an evaluation of her piriformis syndrome. (R. 335). The claimant's head, eyes, ear, nose, and throat exam had "unremarkable" results, her chest was clear, her heart was regular, and she had no significant nerve root encroachment on her right side. The doctor found moderate right lumbar tenderness, and her straight leg raise test was positive on the right. The doctor found

decreased sensation distally in the claimant's right leg and found that her gait was antalgic. Dr. Wilson concluded that the claimant probably had right piriformis syndrome. (R. 335-37).

In August 2015, the claimant returned to Dr. Diethelm and complained of worsening migraines. Dr. Diethelm noted that the claimant had a steady, unstressed gait and that she had full strength in all four extremities. He prescribed the claimant Lyrica to prevent her headaches and manage her lumbar radicular pain. (R. 473). In November 2015, the claimant received a MRI of her lumbar spine in an effort to identify the cause of her back pain. The results showed no abnormalities detected in any of the vertebra. (R. 508). Dr. Wilson performed a NCV/EMG test two days after the MRI; the test showed irritation of the peroneal portion of the sciatic nerve at the level of the piriformis muscle and a similar pattern of irritation of the L5 nerve root. (R. 509).

In March 2016, the claimant attended twelve treatment sessions with a physical therapist. The physical therapist noted a decreased range of motion in the claimant's lumbar spine and minimal to no improvement with therapy. (R. 373).

In August 2016, the claimant returned to Neurology East Medical Center and reported fatigue, headaches, dyspnea, blurred vision, change in bowel movements, joint pain, joint stiffness, muscle weakness, back pain, cold extremities, lightheadedness, dizziness, numbness, tingling, memory loss, anxiety, sadness, and insomnia. The doctor diagnosed her with chronic migraines, and increased her dose of amitriptyline to 50 mh q hs. He provided her with greater occipital nerve blocks, a left trapezius trigger point injection, and a left preauricular block. During the August 2016 appointment, the doctor noted that she had a normal and unstressed gait, intact strength, and normal neurological exam results. (R. 471-72).

In September 2016, Dr. Diethelm referred the claimant to Dr. Watterson at the Alabama Ortho Spine & Sports Medical Center for an evaluation of her fibromyalgia. (R. 468). The doctor

noted that the claimant had no muscle weakness, 2/4 deep tendon reflexes, grossly intact to light touch sensory exam results, and a positive straight leg test on her right. The doctor considered her symptoms consistent with the presence of a baseline component of degenerative arthrosis with no clear evidence of a superior posed more inflammatory arthropathy manifesting. The doctor noted that the diffusely distributed soft tissue-oriented and reproducible discomfort strongly suggested the presence of fibromyalgia. Dr. Watterson said the claimant needed to have her sleep apnea and depression treated to control the fibromyalgia. (R. 469).

In January 2017, the Sleep Disorders Center of Alabama conducted a sleep study on the claimant. The results of the sleep study led to a diagnosis of obstructive sleep apnea.

Also in January 2017, Dr. Wilson referred the claimant to Dr. Barlow at St. Vincent's Hospital for a right L4 and a right L5 transformational epidural steroid injection. Dr. Barlow noted that the claimant was pursuing a spinal cord stimulator as a possible solution for her chronic pain. (R. 452).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits, the claimant requested and received a hearing before an ALJ. (R. 30). At the hearing held on March 29, 2017, the claimant testified that she previously worked as a surgical technologist at Callahan Eye Foundation Hospital. (R. 34). The claimant testified that she had a history of back pain and injured her back while getting dressed several years ago. After her injury, she went on short-term disability, and then long-term disability, until her employer was no longer able to keep her position open and terminated her. (R. 35).

The claimant has not worked since she went on short-term disability in January 2015. (R. 34). She once attempted to assist her mother working at a flea market but had to stop after 30

minutes because her pain made it too difficult to work. (R. 36).

The claimant testified that she can only walk three to four minutes, stand two to three minutes, and sit for ten to twenty minutes. (R. 45). She testified that she could only carry five to ten pounds because of her back pain and she could not carry objects very far. The claimant testified that she is unable to do any housework because of her daily pain level. (R. 44). She testified that she is able to drive but chooses to drive only short distances because her leg locks up if she sits for a long period of time. She also claimed that she has difficulty feeling the pedals because the bottoms of her feet are numb. (R. 44). The claimant is able to care for her children and helps them get ready for school every day. She testified that on a typical day she watches TV, drinks coffee, and naps until her kids return home from school. (R. 43).

The claimant rated her pain at an average of an eight, but asserted that her pain had been a ten at times. (R. 38). The claimant testified that her pain was the main limiting factor in her ability to work and that her pain made her miss three to five days a month from her most recent job as a surgical technologist at Callahan Eye Foundation Hospital. (R. 39).

The claimant testified that, because of her severe insomnia and trouble sleeping at night, she has to lie down or nap between four and five hours out of an eight-hour day.

The claimant testified that while working at Callahan Eye Foundation Hospital, she had to stand 100 percent of the time and she had to carry equipment up to 40 pounds. She would also have to push much heavier pieces of equipment that were on wheels, as well as bend and stoop throughout the day.

Prior to working as a surgical technologist, the claimant worked at Olive Garden as a bartender where she had to carry up to 40 pounds. And prior to working as a bartender, she worked at a Subway where the management also expected her to carry up to 40 pounds. (R. 49).

The claimant reported that when she worked as a pawnbroker at Cash America, the management expected her to move or carry heavy pieces of equipment, such as air compressors, air conditioners, lawn mowers, weed eaters, TV's, and radios. The claimant testified that when she worked at Family Care as a receptionist, management expected her to carry up to 15 pounds. (R. 50-52). The claimant testified that at one point—she could not remember when—her physician, Dr. Wilson, restricted her to lifting five to ten pounds. (R. 56).

At the hearing, the vocational expert, Dr. Green, testified about the type and availability of jobs that the claimant was able to perform. The VE testified that the claimant's past relevant work as a surgical technician is classified as light, performed at medium, and is a skilled position. The pawnbroker position is classified as light, performed at very heavy, and is a skilled position. The receptionist position is classified as sedentary exertion and is semi-skilled, and the bartender position was performed at medium exertion, and is classified as semi-skilled. The position as a sandwich maker at Subway is classified as medium exertion and unskilled, but with some managerial responsibilities. (R. 57-58).

The ALJ asked the VE a series of hypotheticals to determine the claimant's employment capabilities based on her various testimony of limitations as well as objective medical evidence. The ALJ asked the VE to assume that the claimant could perform light work with occasional stooping and crouching and no climbing. In this hypothetical, the ALJ said that the claimant would be able to work in a temperature-controlled environment and would be restricted to simple and repetitive tasks. The VE testified that someone with these limitations could work as a cleaner, housekeeper, bagger, or garment folder. (R. 59). The claimant's only previous job not classified as skilled—a sandwich maker at Subway—is not considered simple and repetitive, so none of her past work would fit the ALJ's first hypothetical.

The ALJ then added to the first hypothetical that the person would need the job to be sedentary and on non-concrete flooring. The VE did not know of any positions that would allow for that person to have these restrictions.

The ALJ then told the VE to disregard the limitation to simple and repetitive tasks for the remaining hypotheticals and to assume that the hypothetical person could only stand or walk five minutes at a time. The VE testified that, with these restrictions, the person would not be able to work as a cleaner or a bagger as he had recommended in the previous hypothetical. The VE also testified that the hypothetical person could perform the claimant's previous receptionist job. (R. 61).

The ALJ then asked about how much of an eight-hour workday the claimant could be off-task and still perform all the duties required of her at a light classified job. The VE testified that the claimant could be off-task up to 10 percent of the workday and would be able to miss one to two days a month in an unskilled position. The VE testified that a skilled position would allow for more days missed a month.

For the ALJ's last hypothetical, he asked the VE if any jobs existed that would allow the claimant the opportunity to lie down up to 50 percent of the workday. The VE testified that no such competitive jobs existed. (R. 62).

*The ALJ's Decision*

On April 26, 2017, the ALJ issued his decision finding that the claimant was not disabled under the Social Security Act. (R. 12). In his decision, the ALJ first found that the claimant met the insured status requirement of the Social Security Act through June 30, 2018 and had not engaged in substantial gainful activity since her alleged onset date of January 20, 2015. (R. 18). Second, the ALJ found that the claimant had severe impairments of lumbar degenerative disc

disease, piriformis syndrome, fibromyalgia, migraines, obesity, and obstructive sleep apnea. Third, the ALJ found that the claimant did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered the claimant's impairments individually and collectively and determined that these impairments did not meet or equal any of the medical listings. He found that no examining or treating source or state agency medical consultant had reported that the claimant had an impairment that met the criteria of a listed impairment. (R. 18).

The ALJ found that the claimant has the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c) which allows her to occasionally stoop and crouch; perform no climbing; work in a temperature-controlled environment; and work in an area that is not on concrete flooring. In making this finding, the ALJ considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, as required by 20 C.F.R. § 404.1529 and SSR 96-4p.

In considering the claimant's symptoms, the ALJ followed a two-step process: (1) the ALJ analyzed whether any underlying, medically determinable, physical or mental impairments existed; and, (2) if so, if these impairments could reasonably be expected to produce the claimant's pain or other symptoms. (R. 19).

Upon reviewing the evidence, the ALJ found the claimant's obesity, in combination with her other impairments, to be a severe impairment. The claimant is 5′5″ and 205 pounds, which places her at a BMI of 34.1. The National Institute of Health, the authority that establishes medical criteria for a diagnosis of obesity, has set the obesity standard at a BMI of 30 or greater. (R. 20).

The ALJ evaluated the claimant's testimony and statements made to doctors about her

limitations and found that her testimony and statements did not appear to be entirely consistent with the fact that she is a caretaker for her three children and her disabled husband. The ALJ considered that the claimant complained to her neurologist that she was experiencing numbness and tingling in the bilateral lower extremities, but her nerve conduction study came back with normal results. The ALJ considered the claimant's physical exam in January 2015 that resulted in the diagnosis of a positive right straight leg test and tenderness on the left side of the paraspinal area of the lower lumbar. The ALJ also acknowledged the results of the January 2015 MRI that showed mild to moderate neutral foramen stenosis at the L4-5 vertebra and a mild right neural foramen stenosis at the L5-S1 vertebra. The ALJ considered the February 2015 CT scan results that showed mild flattening of the ventral surface of the thecal sac—likely reflecting the presence of mild disc budging at L3-4—but no significant root encroachment on the claimant's right side. The ALJ also considered the February 2015 physical exam, which showed normal posture and gait with no weakness or numbness. And the ALJ considered the claimant's neurological exam that showed normal results.

Then the ALJ considered the March 2015 MRI and the November 2015 MRI that both had normal results. The ALJ also considered the claimant's September 2016 exam with Dr. Watterson at Alabama Ortho Spine & Sports that resulted in the doctor finding no muscle weakness, normal muscle bulk and tone, no evidence of peripheral joint swelling, and a non-constrained range of motion of the lumbar spine. After evaluating the totality of the evidence related to the claimant's musculoskeletal impairments, the ALJ found that only limited objective evidence was consistent with the claimant's allegations regarding her impairments and limitations. (R. 19-22)

The ALJ gave good weight to the claimant's treating neurologist, Dr. Fulmer, who wrote

a letter in March 2016 requesting that the claimant be excused from work from February 26, 2015 until March 9, 2015. The ALJ also gave good weight to the claimant's treating neurologist, Dr. Wilson, who also wrote a letter requesting that the claimant be excused from work, this time from March 17, 2015 until April 24, 2015. The ALJ gave these opinions good weight because they were consistent with treatment records, but he also noted that the letters showed only temporary work restrictions. (R. 22).

The ALJ found that the claimant could perform her past relevant work as a surgical technician and bartender, both as she actually performed those jobs and as they are generally performed in the nation's economy. The ALJ gave weight to the VE's testimony that the DOT classifies the claimant's past relevant work as light exertion to sedentary. The ALJ found that the claimant's RFC did not preclude any work-related activities performed by those jobs. Thus, the ALJ concluded that the claimant was not disabled under the Social Security Act. (R. 23).

## VI. DISCUSSION

The claimant contends that the ALJ improperly discounted her subjective complaints of pain, and that the ALJ did not give proper weight to the limitations caused by her migraines, fibromyalgia, sleep apnea, and obesity despite finding them to be severe impairments. The claimant also asserts that the ALJ erroneously found that the claimant could return to her past work because the VE testified that the claimant could *not* perform her past work. For the following reasons, the court finds that substantial evidence supports the ALJ's decision and that the ALJ applied the proper legal standard to his evaluation of the claimant's reported limitations and to his evaluation of the VE's testimony.

*Issue 1: The ALJ's Evaluation of the Claimant's Subjective Complaints in Assessing her RFC*

The court turns first to the claimant's argument that the ALJ erroneously evaluated her

RFC by discounting her reported limitations and failing to account for limitations caused by migraines, fibromyalgia, sleep apnea, and obesity despite finding them severe impairments.

As stated above, an ALJ evaluating a claimant's pain and other subjective complaints must first consider whether the claimant demonstrated an underlying severe medical condition. *Holt*, 921 F.2d at 1223. If the claimant shows an underlying severe medical condition, then the ALJ must determine if any objective medical evidence confirms the severity of the reported pain, or if the underlying medical condition has been objectively confirmed and is so severe that one could reasonably expect it to result in the reported pain. *Id.* Testimony of subjective pain that is supported by objective medical evidence that can reasonably be expected to produce the reported symptoms is itself sufficient to sustain a finding of disability. *Hale*, 831 at 1011. If the ALJ refuses to credit such testimony, he must articulate explicit and adequate reasons for doing so. *Id.* If the ALJ does not articulate reasons, the court must accept the claimant's testimony as true. *Holt*, 921 F.2d at 1236. But the court will not disturb the ALJ's "clearly articulated credibility finding with substantial supporting evidence in the record." *Foote*, 67 F.3d at 1562.

In this case, the ALJ evaluated the claimant's reported pain and limitations caused by her migraines, fibromyalgia, sleep apnea, obesity, and back pain, and properly articulated his reasons for discrediting the claimant's subjective testimony. The ALJ concluded that while some of the objective evidence pointed to mild impairments that could reasonably cause some of the claimant's symptoms, the claimant's subjective testimony regarding limitations, persistence, and intensity of pain were not entirely consistent with the objective evidence. (R. 22). Specifically, the ALJ looked to the claimant's medical records and the fact that the claimant has three children and a disabled husband for whom she cares. (R. 19). The ALJ also relied on numerous tests and physical exams between 2014 and 2017 that showed normal results. The test results that did

show signs of an impairment—the January 2015 MRI and the February 2015 lumbar myelography—reported only mild impairment. (R. 20). The ALJ reasonably determined that these test results showed that the claimant's reported limitations were not consistent with the objective medical evidence.

So, substantial evidence supports the ALJ's determination that the claimant's subjective complaints and reported limitations were not consistent with objective evidence. Thus, the ALJ properly discredited the claimant's reported limitations caused by her various conditions.

*Issue 2: The ALJ's Finding that the Claimant Could Perform her Past Relevant Work*

The claimant next argues that substantial evidence does not support the ALJ's finding that the claimant could perform her past relevant work. The claimant asserts that the ALJ's finding contradicts the VE's testimony that, based on the claimant's RFC, the claimant could not perform her past work. (R. 22-23). The court disagrees; for the following reasons, the ALJ's finding does *not* contradict the VE's testimony.

A hypothetical question that the ALJ poses to a VE need only contain those functional restrictions the ALJ finds supported by the record. *See McSwain v. Bowen*, 814 F.2d 617, 619–20 (11th Cir. 1987); *Graham v. Bowen*, 790 F.2d 1572, 1676 (11th Cir. 1986). The hypothetical questions should not simply include all subjective complaints made by the claimant. *McSwain,* 814 F.2d at 619–20. For a VE's testimony to constitute substantial evidence that supports the ALJ's decision, the ALJ must pose at least one hypothetical question that encompasses all of the claimant's reported impairments. *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) (per curiam); *Winschel v. Commr. of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011). And the ALJ must consider the combined effect of all the claimant's impairments when determining whether a claimant is disabled. *McSwain,* 814 F.2d at 619–20.

In this case, the ALJ asked several hypothetical questions to the VE with various limitations. (*See* R. 57-63). Contrary to the claimant's argument, the ALJ did *not* only ask the VE about a hypothetical person with an RFC with a limitation for simple and repetitive tasks. Though the ALJ initially limited his hypotheticals to simple and repetitive tasks, he later removed this limitation. (*See* R. 61–63). When the ALJ removed the limitation for simple and repetitive work in the RFC, the VE testified that the claimant *could* perform her past relevant work with limitations to light work with other non-exertional limitations. (R. 61). Likewise, the VE went on to testify that a person with the claimant's education and work experience, who was limited to standing and walking to five minutes at a time, *could* perform the claimant's past work as a receptionist. (R. 61). So the record does not support the claimant's contention that the VE's testimony and the ALJ's decision are at odds with each other.

Rather, the ALJ's decision that the claimant could return to her past relevant work is consistent with the VE's testimony and the claimant's medical record, so substantial evidence supports the ALJ's determination that the claimant could return to her past relevant work. *See Wilson,* 284 F.3d at 1227 (finding that a VE's testimony is substantial evidence in support of the ALJ's decision if the ALJ poses at least one hypothetical question that encompasses all of the claimant's reported impairments that are supported by the record).

## VII. CONCLUSION

For the reasons stated above, substantial evidence supports the Commissioner's decision. Accordingly, by separate order, the court will **AFFIRM** the Commissioner's decision.

**DONE** and **ORDERED** this 23rd day of September, 2019.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE